**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION**

| | | |
|---|---|---|
| STEVE HARTMAN, | ) | CASE NO. 1:08-cv-03034 |
| | ) | |
| Plaintiff, | ) | |
| | ) | MAGISTRATE JUDGE GREG WHITE |
| v. | ) | |
| | ) | |
| MERCEDES-BENZ, U.S.A., L.L.C. , | ) | |
| | ) | |
| Defendant. | ) | **MEMORANDUM OPINION AND** |
| | ) | **ORDER** |

On January 15, 2010, Defendant Mercedes-Benz, U.S.A., L.L.C. (hereinafter

"Defendant") filed a Motion for Partial Summary Judgment.  (Doc. No. 21.)[1]  Plaintiff Steve

Hartman (hereinafter "Plaintiff") filed his response on February 8, 2010.  (Doc. No. 26.)

Defendant filed a reply on February 19, 2010.  (Doc. No. 27.)

## I.  FACTS

Plaintiff's Complaint contains five counts of actions against Defendant.  (Doc. No. 1,

Exh. A.)  In Count I, Plaintiff alleges a violation of the Ohio Revised Code ("O.R.C.") §§

1345.71 through 1345.77, commonly referred to as the "Ohio Lemon Law."  (Compl. at ¶¶9-18.)

In Count II, Plaintiff alleges a violation of the Magnuson-Moss Federal Trade Commission Act,

---

[1]  On February 2, 2010, Defendant withdrew its previously filed motion for judgment on
the pleadings under Fed. R. Civ. P. 12(c), as the arguments set forth in that motion were
incorporated into this motion for partial summary judgment.  (Doc. No. 25.)

15 U.S.C. § 2310 for breach of express and implied warranties. (Compl. at ¶¶19-29.) In Count III, Plaintiff alleges that Defendant is liable under contractual and statutory obligations due to breaching an express warranty, an implied warranty of merchantability, and/or an implied warranty of fitness for a particular purpose. (Compl. at ¶¶30-35.) In Count IV, Plaintiff alleges that Defendant breached its contractual, statutory, and/or common law obligations resulting in a tort claim. (Compl. at ¶¶36-40.) Finally, in Count V, Plaintiff alleges a violation of O.R.C. §§ 1345.02 and 1345.03, commonly referred to as the "Ohio Consumer Sales Practices Act." (Compl. at ¶¶41-65.) Defendant seeks summary judgment on Counts I, IV, and V, as well as the breach of implied warranty allegations in Counts II and III.[2] (Mot. for Summ. J. at 1.)

The causes of action contained in the Complaint revolve around Plaintiff's lease of a 2007 Mercedes S550 ("vehicle") from Ganley Toyota-Mercedes-Benz on February 15, 2007. (Compl. at ¶3; Reply, Exh. A.) Plaintiff claims that Defendant, through its authorized dealer(s), was unable to effectively repair defects in the vehicle, thereby rendering it "worthless and/or substantially impaired." (Compl. at ¶6.)

## II. STANDARD OF REVIEW

Federal Rule of Civil Procedure 56(c) governs summary judgment motions and, in pertinent part, states:

> The judgment sought should be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to a judgment as a matter of law.

Rule 56(e) specifies the materials that may be submitted in connection with a motion for

---

[2] Plaintiff's claims for breach of an express warranty are not covered by Defendant's motion for partial summary judgment. (Memo. in Support of Summ. J. at 1.)

summary judgment:

> (1) In General.  A supporting or opposing affidavit must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant is competent to testify on the matters stated . . . .  The court may permit an affidavit to be supplemented or opposed by depositions, answers to interrogatories, or additional affidavits.
>
> (2) Opposing Party's Obligation to Respond.  When a motion for summary judgment is properly made and supported, an opposing party may not rely merely on allegations or denials in its own pleading; rather, its response must– by affidavits or as otherwise provided in this rule–set out specific facts showing a genuine issue for trial.  If the opposing party does not so respond, summary judgment should, if appropriate, be entered against that party.

The moving party is not, however, required to file affidavits or other similar materials negating a claim on which its opponent bears the burden of proof, so long as the moving party relies upon the absence of the essential element in the pleadings, depositions, answers to interrogatories, and admissions on file.  *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986), cert. denied, 484 U.S. 1066 (1988).

In reviewing summary judgment motions, this Court must view the evidence in a light most favorable to the non-moving party to determine whether a genuine issue of material fact exists.  *See, e.g., Adickes v. S.H. Kress & Co.*, 398 U.S. 144 (1970); *White v. Turfway Park Racing Ass'n, Inc.*, 909 F.2d 941, 943-44 (6th Cir. 1990).  A fact is "material" only if its resolution will affect the outcome of the lawsuit.  *See, e.g., Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

Summary judgment is appropriate whenever the non-moving party fails to make a showing sufficient to establish the existence of an element essential to that party's case and on which that party will bear the burden of proof at trial.  *Celotex Corp. v. Catrett*, 477 U.S. 317,

-3-

322 (1986).  Moreover, "the trial court no longer has a duty to search the entire record to

establish that it is bereft of a genuine issue of material fact." *Street v. J.C. Bradford & Co.*, 886

F.2d 1472, 1479-80 (6th Cir. 1989) (*citing Frito-Lay, Inc. v. Willoughby*, 863 F.2d 1029, 1034

(D.C. Cir. 1988)).  The non-moving party is under an affirmative duty to point out specific facts

in the record which create a genuine issue of material fact.  *See, e.g., Fulson v. City of Columbus*,

801 F. Supp. 1, 4 (S.D. Ohio 1992).  The non-movant must show more than a scintilla of

evidence to overcome summary judgment; it is not enough for the non-moving party to show that

there is some metaphysical doubt as to material facts.  *Id.*

### III.  LAW AND ANALYSIS

**A.   Count I: Ohio Lemon Law**

In Count I, Plaintiff alleges a violation of the Ohio Lemon Law.  (Compl. at ¶¶9-18.)

The relevant statute states as follows:

> (A) If a new motor vehicle does not conform to any applicable express warranty
> and the consumer reports the nonconformity to the manufacturer, its agent, or its
> authorized dealer *during the period of one year following the date of original
> delivery or during the first eighteen thousand miles of operation*, whichever is
> earlier, the manufacturer, its agent, or its authorized dealer shall make any repairs
> as are necessary to conform the vehicle to such express warranty, notwithstanding
> the fact that the repairs are made after the expiration of the appropriate time
> period.
>
> (B) If the manufacturer, its agent, or its authorized dealer is unable to conform the
> motor vehicle to any applicable express warranty by repairing or correcting any
> nonconformity after a reasonable number of repair attempts, the manufacturer, at
> the consumer's option and subject to division (D) of this section, either shall
> replace the motor vehicle with a new motor vehicle acceptable to the consumer or
> shall accept return of the vehicle from the consumer and refund each of the
> following:
>
> (1) The full purchase price;
>
> (2) All incidental damages, including, but not limited to, any fees charged by

-4-

the lender or lessor for making or canceling the loan or lease, and any expenses incurred by the consumer as a result of the nonconformity, such as charges for towing, vehicle rental, meals, and lodging.

O.R.C. § 1345.72 (emphasis added).

Defendant asserts that summary judgment is appropriate, because Plaintiff did not report an alleged non-conformity within one year of delivery, nor did he provide Defendant an opportunity to correct the alleged defects.  (Memo. in Support of Summ. J. at 4-6; Reply at 1-6.) Specifically, Defendant maintains that Plaintiff first obtained service for his vehicle due to an alleged non-conformity on June 18, 2008 – well after the one year period, which expired on February 14, 2008.  *Id.*  Conversely, Plaintiff claims that he reported a defective condition with respect to the tire pressure sensor in January of 2008.  (Pl.'s Response at 6-7.)

The relevant deposition testimony of Plaintiff reads as follows:

**Q.**  Do you recall the first time that you made a complaint about the vehicle to a Mercedes-Benz dealer?

**A.**  I called to ask questions.  I was having problems with the vehicle where I was constantly getting gauges that were going off with regard to low tire pressure sensor and things like that.  I  called the dealership to ask a question because it was happening very intermittently.
    We would check the tire pressure, and it would -- you know, the gauge, the little tool that you would use at a gas station would say that everything was fine. A lot of times it was saying that the tires were up high, then it was down low and up and down.  The tires would always check with a gauge as fine.
    So I called to find out, you know, what does that mean, are you having, you know, problems with that type of sensor or something like that.

**Q.**  Do you recall -- I'm sorry.

**A.**  And that was happening intermittently for probably up to six months before I actually took it in, because the gauge was always saying that the tire pressure was fine.  I had called, and they said it's probably, you know, with heat and cold, that the tires would go up and down.  So sometimes it was doing low readings, sometimes it was doing high readings, and they said that, unfortunately, that's part of having electronics in a car.

-5-

So it would happen infrequently, and then I had my first service that was
coming up.  I took the vehicle in at that point and asked them to check on that
sensor that had been going off the last, you know, four to six months, and also I
had a door on the passenger side of the vehicle that it wouldn't stay open.  You
would open it, and it would just start closing on you.

**Q.**  Let's break down what you just said, if you don't mind.

**A.**  Okay.

**Q.**  I think you indicated the first time you brought in the vehicle was in
connection with the flex service or oil service?

**A.**  Yes. Correct.

**Q.**  Prior to that point, you had some discussions with a dealership?

**A.**  Correct.

**Q.**  With respect to the tire pressure gauge?

**A.**  Correct.

(Doc. No. 21, Pl.'s Depo. at 40-42.)[3]

Plaintiff concedes that it is his burden under the Ohio Lemon Law to establish that he

reported the non-conformity within one year.  (Pl.'s Response at 5.)  Summary judgment is

appropriate where the non-moving party cannot make a showing sufficient to establish the

existence of an element essential on which that party will bear the burden of proof at trial.

*Celotex Corp.*, 477 U.S. at 322.  Though the evidence must be construed in the light most

favorable to Plaintiff, the above testimony only serves to establish that somewhere between four

to six months prior the June 18, 2008 service, Plaintiff began experiencing problems with the

vehicle's tire pressure sensor.  At no point, however, does Plaintiff identify with any specificity

---

[3]  Plaintiff has provided no other documents or affidavits that more specifically set forth
the reporting date.

when he called the dealer, except that it was sometime before the June 18, 2008 service.

Any complaints made between February 15, 2008 and the service date would fail to satisfy the one year requirement under the Ohio Lemon Law.  Though Plaintiff believes that his problems with the tire pressure sensor may have started as early as mid-December 2007 – six months before the service date, a reasonable mind cannot construe this as establishing he made his telephone complaint prior to February 15, 2008, as Plaintiff concedes that his issues with the sensor may have not started until the middle of February 2008 – four months prior to the service. Plaintiff did not testify that he called the dealer immediately or soon after he first started to experience the problem.  In fact, Plaintiff stated that he called the dealership because the tire pressure sensor indicator had been going off "very intermittently."  (Depo. at 41.)  Thus, by his own testimony, it appears the Plaintiff did not call the dealer the first time the problem occurred.

The difficulty with Plaintiff's testimony, as it relates to summary judgment, is that even if believed and accepted in total, one could still not reasonably conclude that Plaintiff reported a non-conformity to the dealer prior to February 15, 2008.  The only conclusion that can reasonably be reached is that Plaintiff does not know whether his complaint to the dealer occurred within one year of his taking possession of the vehicle.  This does not meet his burden.

In addition, even if there was a genuine issue of material fact concerning the issue of when the alleged non-conformity was first reported, Plaintiff's claim would still be unable to withstand summary judgment.  The Ohio Lemon Law states that "'[n]onconformity' means any defect or condition that substantially impairs the use, value, or safety of a motor vehicle to the consumer and does not conform to the express warranty of the manufacturer or distributor."  O.R.C. § 1345.71(E).  The Ohio Supreme Court has observed that the Lemon Law "does not create

-7-

remedies for buyers who have soured on their new vehicle for cosmetic or other trivial reasons...

[and that there is] ... the requirement of a major defect and the right of the manufacturer to

preclude recovery by prompt repair ...."  *Royster v. Toyota Motor Sales, U.S.A.*, 750 N.E.2d 531,

92 Ohio St. 3d 327, 331 (Ohio 2001).  A recent opinion from the Sixth Circuit Court of Appeals

noted as follows:

> Ohio's appellate courts have held that, as a matter of law, "nonconformities" do
> not include "intermittent groaning, grinding noise[s]," "vibrations," or other
> complaints that did not affect the "engine, drive train, or mechanical functioning"
> of the automobile, *Miller v. DaimlerChrysler Motors Corp.*, No. 78300, 2001
> Ohio App. LEXIS 2450, at *10 (Ohio Ct. App. May 31, 2001) (unpublished); a
> "warning light problem" that "posed no threat to . . . the driveability" or "safety"
> of the vehicle, *LaBonte v. Ford Motor Co.*, No. 74855, 1999 Ohio App. LEXIS
> 4795, at *13-*15 (Ohio Ct. App. Oct. 7, 1999) (unpublished); a consumer's
> "subjective 'shaken faith' in the car," *Stepp v. Chrysler Corp.*, No. 95CA000052,
> 1996 Ohio App. LEXIS 6026, at *3-*4 (Ohio Ct. App. Nov. 7, 1996)
> (unpublished); "noise" that was "an inherent condition of the vehicle" and which
> did not cause the vehicle "to fail," *id.* at *4; alleged problems that were actually
> "normal performance characteristics of a vehicle," *Kleinman v. Chrysler Motor
> Corp.*, No. 94 CA 2234, 1995 Ohio App. LEXIS 2321, at *14 (Ohio Ct. App.
> May 26, 1995) (unpublished); a "lag" in a vehicle's transmission that could not be
> corrected because it "was really the normal shift pattern of that particular vehicle"
> and it "was performing as designed," *Hill v. Toyota Motors Sales, U.S.A., Inc.*,
> No. CA 14465, 1995 Ohio App. LEXIS 471, at *7 (Ohio Ct. App. Feb. 10, 1995);
> and "'fit and finish' adjustments to parts such as moldings, windows, bumpers
> and headlights," *Gen. Motors Acceptance Corp. v. Hollanshead*, 105 Ohio App.
> 3d 17, 663 N.E.2d 663, 666 (Ohio Ct. App. 1995).

*Benit v. Mercedes-Benz USA, LLC*, 2009 U.S. App. LEXIS 6369, 6-7 (6th Cir. Mar. 3, 2009).

Especially relevant is the *LaBonte v. Ford* decision, which noted that a malfunctioning

check engine warning light did not substantially impair the value of the vehicle, nor did it affect

the use or safety of the vehicle.  1999 Ohio App. LEXIS 4795 at **13-15.  Plaintiff himself

stated during his deposition that, although the tire pressure sensor would fluctuate between high

pressure and low pressures warnings, pressure gauge readings he took always indicated normal

-8-

tire pressure. (Depo. at 42.) As such, a reasonable mind could not conclude under Ohio law that the value, use, or safety of the vehicle was substantially impaired within the first year after delivery. As such, Count I of Plaintiff's Complaint fails as a matter of law and summary judgment is granted.

**B.** **Counts II and III: Breach of Implied Warranty Under the Magnuson-Moss Warranty Act and the Ohio Uniform Commercial Code**

In Counts II and III, Plaintiff alleges that Defendant's actions resulted in a breach of an implied warranty under both the Magnuson-Moss Warranty Act ("MMWA") and the Ohio Uniform Commercial Code ("UCC"). (Compl. at ¶¶19-35.) Defendant asserts that it is entitled to summary judgment, as the law requires privity of contract between the parties to recover in Ohio under the UCC and the MMWA. (Memo. in Support of Summ. J. at 7-9; Reply at 6-8.) "The term 'implied warranty' means an implied warranty arising under State law (as modified by sections 108 and 104(a)) [15 USCS §§ 2308 and 2304(a)] in connection with the sale by a supplier of a consumer product." 5 U.S.C. § 2301(7); *Voelker v. Porsche Cars N. Am., Inc.*, 353 F.3d 516, 525 (7th Cir. 2003) ("Because §§ 2308 and 2304(a) do not modify, or discuss in any way, a state's ability to establish a privity requirement, whether privity is a prerequisite to a claim for breach of implied warranty under the [MMWA] therefore hinges entirely on the applicable state law.") The Ohio Supreme Court has held that "purchasers of automobiles may assert a contract claim for breach of implied warranty of merchantability, pursuant to the [MMWA], only against parties with whom they are in privity of contract." *Curl v. Volkswagen of America, Inc.*, 871 N.E.2d 1141, 114 Ohio St.3d 266 at paragraph one of the syllabus (Ohio 2007).

In *Curl*, the Ohio Supreme Court noted that "vertical privity exists only between immediate

-9-

links in the distribution chain." 781 N.E.2d at 1148.  Plaintiff acknowledges the privity

requirement, but asserts that privity exists because the authorized dealer that leased him the

vehicle was an "immediate link" in the distribution chain with the manufacturer.  (Pl.'s Response

at 10-11.)  Plaintiff further argues that the facts in *Curl* are distinguishable, as the buyer therein

purchased the vehicle from a dealer that had first used the vehicle as a rental car.  *Id*. at 9-10.

Plaintiff construes *Curl* as affirming his position that manufacturers and consumers are in direct

vertical privity.  This Court's own review does not confirm Plaintiff's argument.  In fact, the

*Curl* court cites *Haynes v. George Ballas Buick-GMC Truck*, 1990 Ohio App. LEXIS 5661

(Ohio Ct. App. Dec. 21, 1990) with approval as presenting a similar case.  In actuality, the

*Haynes* case is factually more similar to the present case than *Curl*.  In *Haynes*, a consumer sued

both the dealer and the manufacturer for breach of express and implied warranties.  The *Haynes*

court found that the plaintiff could not maintain her UCC and MMWA implied warranty claims

against the manufacturer due to a lack of vertical privity.  *Curl*, 781 N.E.2d at 1146, *citing*

*Haynes*, 1990 Ohio App. LEXIS 5661 at *33.

Similarly, the United States District Court for the Southern District of Ohio addressed a

similar situation to the one before this Court.  In *Ultimax, Inc. v. Mercedes-Benz USA, LLC*,

2008 U.S. Dist. LEXIS 28475 (S.D. Ohio Apr. 8, 2008), the plaintiff sued a car manufacturer for

breach of implied warranties under the MMWA and UCC.  Therein, the plaintiff had purchased

the vehicle from Germain, a car dealer that was an authorized distributor of the manufacturer.

*Id*. at **1-2.  The *Ultimax* court found as follows:

> [P]laintiff must establish privity between himself and Defendant to succeed on an
> implied warranty claim.  In this case, Defendant did not directly sell the Vehicle
> to Plaintiff.  Rather, Plaintiff bought the Vehicle from an intermediary, Germain.
> (Compl. ¶1, R. at 3.)  Plaintiff is in privity with Germain, but not with Defendant.

-10-

> This lack of privity between Plaintiff and Defendant dooms Plaintiff's implied warranty claim. *Curl*, 114 Ohio St. 3d at 272. Furthermore, because there is no actionable state law implied warranty claim, there can be no Magnuson-Moss Warranty Act claim based on an implied warranty. *Temple*, 133 F.App'x. at 268.

2008 U.S. Dist. LEXIS 28475 at *26.

Here, the Motor Vehicle Lease Agreement clearly indicates that Plaintiff was the lessee of the vehicle while non-party Ganley Akron, Inc., the auto dealer, was the lessor. (Doc. No. 26, Exh. A.) Other than arguing customary practices in automobile sales and manufacturing, Plaintiff has not identified any evidence that would tend to show that Plaintiff and Defendant were in privity of contract. The Court finds that Plaintiff is in privity with Ganley Akron, Inc., but not with Defendant. Therefore, Plaintiff can neither maintain an actionable state law claim against Defendant for breach of an implied warranty under the UCC, nor an action for breach of an implied warranty under the MMWA. Consequently, no genuine issue of material fact remains, and summary judgment is granted on Counts II and III to the extent they allege a breach of an implied warranty.

**C.    Count IV: Breach of Implied Warranty in Tort**

In Count IV, Plaintiff alleges that Defendant breached its contractual, statutory, and/or common law obligations resulting in a tort claim. (Compl. at ¶¶36-40.) Defendant argues that this action cannot be sustained under Ohio law, because (1) Plaintiff has adequate contractual remedies through Defendant's express warranty, and (2) Plaintiff suffered only economic loss from the alleged defect. (Memo. in Support of Summ. J. at 9-12.)

Ohio law recognizes a cause of action for breach of an implied warranty in tort in the absence of privity of contract.

> In Ohio, there has been some confusion about the difference between tort actions

-11-

> sounding in breach of express or implied warranty and tort actions sounding in
> strict liability.  Undoubtedly much of the confusion derives from the use of the
> word "warranty," which suggests contract and its attendant requirement of privity.
> Indeed, the implied warranty action has been described as a "hybrid" action, with
> its "commencement in contract and its termination in tort."  However, as we
> stated in *Iacono v. Anderson Concrete Co.*, *supra*, at 91, 71 O.O.2d at 68, 326
> N.E.2d at 269, fn. 1, "[t]his court has recognized that, historically, an action
> grounded on breach of warranty sounded in tort rather than contract.  It is a
> mistaken notion that use of the term 'warranty' always carried the implication of a
> contractual relationship.
>
> ***
>
> However, while the damages sustained in *Iacono* were described as "property"
> damage, they were in fact merely defects in the product itself which reduced the
> product's value, *i.e.*, economic damages. *Mead Corp.*, *supra*, at 366; Note,
> Recovery of Direct Economic Loss: The Unanswered Questions of Ohio Products
> Liability Law (1977), 27 Case W. Res. L. Rev. 683, 685-690.  Thus, taken
> together, *Inglis* and *Iacono* stand for the proposition that in Ohio an action in tort
> for breach of express or implied warranty, or an action in strict liability, may be
> maintained for purely economic loss.

*Chemtrol Adhesives, Inc. v. American Mfrs. Mut. Ins. Co.*, 42 Ohio St. 3d 40, 46-49, 537 N.E.2d

624 (Ohio 1989) (internal citations omitted); *LaPuma v. Collinwood Concrete*, 75 Ohio St. 3d

64, 661 N.E.2d 714 (Ohio 1996) ("Ohio's product liability statutes, by their plain language,

neither cover nor abolish claims for purely economic loss caused by defective products. *** A

cause of action for damage to the product itself, *i.e.*, a cause of action alleging only economic

damages, is not included in the statutory definition of a 'product liability claim' contained."); *see

also* 76 Ohio Jurisprudence - Products Liability §§1-2.  In other words, while product liability

claims do not include claims that allege economic loss stemming solely from a defect in the

product itself, such claims are not precluded by statute.  As such, Plaintiff's claim is not barred

simply because he seeks to recover only for economic loss.

    Defendant also asserts that Plaintiff is not entitled to maintain a cause of action for breach

-12-

of implied warranty in tort because he has adequate remedies by way of the express warranty claim.  Defendant concedes, however, that "the law is not well developed on whether a breach of an implied warranty in tort claim can exist in the presence of a valid, enforceable written warranty."  (Def.'s Reply at 8.)  After review of the case law cited by the parties, the Court agrees that Ohio law is unclear on this matter, and the law cited does not address factual circumstances similar to the one before the Court.  As such, Defendant's motion for partial summary judgment with respect to Plaintiff's claim for breach of an implied warranty in tort is denied.

**D.    Count V: Ohio Consumer Sales Practices Act**

In Count V, Plaintiff alleges a violation of the Ohio Consumer Sales Practices Act ("OCSPA").  (Compl. at ¶¶41-65.)  Defendant argues that this action cannot be sustained under Ohio law, because the leased vehicle was not primarily for personal, family, or household use. (Memo. in Support of Summ. J. at 12-13.)

Pursuant to O.R.C. § 1345.01(A), a "'[c]onsumer transaction' means a sale, lease, assignment, award by chance, or other transfer of an item of goods, a service, a franchise, or an intangible, to an individual for purposes that are primarily personal, family, or household, or solicitation to supply any of these things."  *See also Culbreath v. Golding Enters.*, 114 Ohio St. 3d 357, 358,  872 N.E.2d 284 (Ohio 2007) ("[T]here is no OCSPA violation [where] no 'individual,' i.e., natural person, was involved in the transaction.").  When determining whether a transaction constitutes a "consumer transaction," courts should look to "the point a binding agreement is entered into and that 'objective manifestations of the parties, as set forth by the totality of the circumstances' determine the limits of a consumer transaction."  *Jackson v.*

-13-

*Krieger Ford, Inc.*, 1989 Ohio App. LEXIS 1201 at *7 (Ohio Ct. App. Mar. 28, 1989).

However, where the objective manifestations of the parties at the time of the agreement are

unclear, courts should consider the principal use to which the goods, herein the vehicle, were

used. *Id.* at *9; *State ex rel. Celebrezze v. Howard*, 77 Ohio App. 3d 387, 393, 602 N.E.2d 665

(Ohio Ct. App. 1991) ("[T]he general principle that remedial acts should be liberally construed

continues to apply to the CSPA when defining who the parties to a transaction are.") (*citing State

ex rel. Celebrezze v. Hughes*, 58 Ohio St.3d 273, 569 N.E.2d 1059 (Ohio 1991)).

Here, the lease was in Plaintiff's name, but it does not specify whether the vehicle was for

personal or business use.[4]  (Doc. No. 26, Exh. A.)  Therefore, it is unclear whether the lease was

a consumer transaction at the time it was created and the Court must look to other circumstances.

Plaintiff testified as follows regarding his use of the vehicle:

> **Q.** What was the purpose for your lease of this vehicle, what did you intend to
> use this vehicle for?
>
> **A.** To use the vehicle for business, to use the vehicle to get to places that I would
> need to go to, to have a reliable transportation, to go to various different places,
> both business and personal, to have a, you know, very high quality luxurious
> vehicle to be proud to own and go to these various places both professionally and
> personally.
>
> **Q.** You noted you used it for some business use. Can you explain that a little bit?
>
> **A.** I have to, you know, drive to work, I go to appointments with clients, I visit
> their homes, I go to different places with them.  We all have a life, you have to go
> grocery shopping, go to Cavs games, you know, so both business and personal.
>
> **Q.** Did you deduct your business use on your taxes?
>
> **A.** Yes.

_____

[4]  The lease contains two boxes, one specifies personal use while the other specifies
business, commercial, or agricultural use.  Neither box was checked.  (Doc. No. 26, Exh.
A.)

**Q.** How much would you say is business use versus personal use?

**A.** Almost all of it.  I work -- I'm your basic workaholic.

**Q.** So pretty much 90, 100 percent business use?

**A.** My accountant would have the full answer. But, yes, even when I'm socializing, it tends to be with clients and going to various different things on behalf of clients.

***

**Q.** Bottom line is, you use the vehicle primarily for business use?

**A.** Yes.

**Q.** And you believe that your accountant deducts that use from your personal taxes?

**A.** Yes. He does whatever is appropriate within the law.

Even construing the OCSPA liberally and giving all reasonable factual inferences to Plaintiff as the non-moving party, no reasonable juror could conclude that the vehicle was primarily for personal use based on Plaintiff's testimony.  As such, summary judgment is granted as to Count V of the Complaint.

## IV.  CONCLUSION

For the foregoing reasons, Defendant's Motion for Partial Summary Judgment is GRANTED in part and DENIED in part.  Specifically, Defendant's motion is granted with respect to Counts I and V, granted with respect to Counts II and III to the extent they allege a breach of an implied warranty (but not breaches of express warranties), and denied with respect to Count IV.

IT IS SO ORDERED.

s/ Greg White         <br>U.S. MAGISTRATE JUDGE

Date: March 11, 2010.

-15-